# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAMSTERS LOCAL NO. 1150 PRESCRIPTION DRUG BENEFIT PLAN, on behalf of itself and all others similarly situated, <br><br>             Plaintiff, <br><br> v. <br><br> ABBVIE, INC., ALLERGAN, INC., ALLERGAN SALES, LLC, ALLERGAN USA, INC., FOREST LABORATORIES, INC., FOREST LABORATORIES, LLC, FOREST LABORATORIES HOLDINGS, LTD., and FOREST LABORATORIES IRELAND LTD., <br><br>             Defendants. | CASE NO. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     JURISDICTION AND VENUE.................................................................................11

III.    THE PARTIES ............................................................................................................12

IV.     UNNAMED (AS DEFENDANTS) CO-CONSPIRATORS .........................................15

V.      ECONOMIC BACKGROUND ..................................................................................16

VI.     REGULATORY BACKGROUND..............................................................................19

        A.      The Hatch-Waxman Amendments.....................................................................19

        B.      Regulator Exclusivities for New Drugs. ...........................................................20

        C.      ANDA Paragraph IV Certifications..................................................................21

        D.      The First Filer's 180-day Exclusivity Period. ....................................................22

        E.      Patents Are Not Bulletproof. ............................................................................23

        F.      The Competitive Effects of AB-Rated Generic Competition...............................24

                1.      The first AB-rated generic is priced below the brand. .............................26

                2.      Later generics drive prices down further...............................................27

        G.      Pharmaceutical Manufacturers Can Game the Regulatory Structure in
                Order to Impair Competition. ...........................................................................28

                1.      Side deals provide a means for manufacturers to share the gains
                        from conspiring. .................................................................................31

VII.    FACTS .......................................................................................................................32

        A.      Basic Chemistry Relating to the Active Pharmaceutical Ingredient in
                Bystolic.............................................................................................................32

        B.      Forest's Bystolic Patents. .................................................................................36

        C.      The Generic Competitors File ANDAs for Generic Versions of Bystolic............41

        D.      The Bystolic Patent Litigation. .........................................................................42

E.      Forest Enters into Unlawful Reverse-Payment Agreements with the
        Generic Competitors. ............................................................................45

VIII.   MARKET POWER AND DEFINITION ........................................................51

IX.     MARKET EFFECTS.....................................................................................54

X.      ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE..................55

XI.     EFFECT ON INTRASTATE COMMERCE ..................................................57

XII.    CLASS ACTION ALLEGATIONS................................................................58

XIII.   COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS .........................62

XIV.    CLAIMS FOR RELIEF ...............................................................................64

XV.     DEMAND FOR JUDGMENT .......................................................................91

XVI.    JURY DEMAND .........................................................................................92

Plaintiff Teamsters Local No. 1150 Prescription Drug Benefit Plan ("Plaintiff" or "Local 1150"), brings this action on behalf of itself, and all others similarly situated, against AbbVie, Inc. ("Abbvie"); Allergan, Inc., Allergan Sales, LLC, and Allergan USA, Inc. (collectively, "Allergan"); and Forest Laboratories, Inc., Forest Laboratories, LLC, Forest Laboratories Holdings, Ltd., and Forest Laboratories Ireland Ltd. (collectively, "Forest") (together, Abbvie, Allergan and Forest are "Forest" or "Defendants").  These allegations are based on investigations of counsel, publicly available materials and knowledge, information, and belief.

## I.    INTRODUCTION

1.    This case arises from Defendants' illegal scheme to unlawfully delay competition in the United States and its territories and prevent the entry of less expensive generic versions of Bystolic, a prescription drug manufactured by Defendants Forest and its successors, and approved by the U.S. Food and Drug Administration ("FDA") for  the  treatment of high blood pressure or hypertension.

2.    Bystolic, also known as "nebivolol hydrochloride" or "nebivolol HCl," is a "beta blocker."  It blocks the action of certain natural substances in a patient's body on the heart and blood vessels and thereby lowers heart rate, blood pressure, and strain on the heart.  Bystolic is a blockbuster drug.  According to IMS Health sales data for the 12-month period ending March 2017, Bystolic had annual sales of approximately $1 billion.[1]

3.    Recognizing the huge opportunity for this medication, on or about December 17, 2011, generic drug manufacturers began to file Abbreviated New Drug Applications ("ANDAs") with the United States Food and Drug Administration ("FDA") seeking approval to market generic nebivolol HCl.

---

[1] IMS Health National Sales Perspectives: Retail & Non-Retail, March 2017.

4.      But no generic competitor has or will enter until September 17, 2021. Instead, Forest engineered a series of unlawful reverse-payment deals (also known as "pay for delay" deals) with each of its would-be generic competitors, specifically, Hetero Labs Ltd. and Hetero USA Inc. (collectively, "Hetero"); Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (collectively, "Torrent"); Alkem Laboratories Ltd. ("Alkem"); Indchemie Health Specialties Private Ltd. ("Indchemie"); Glenmark Generics Inc., USA, Glenmark Generics Ltd. and Glenmark Pharmaceuticals Ltd. (collectively, "Glenmark"); Amerigen Pharmaceuticals Ltd. and Amerigen Pharmaceuticals Inc. (collectively, "Amerigen"); and Watson Pharma, Inc. and Watson Pharmaceuticals, Inc. (collectively "Watson") (together, Hetero, Torrent, Alkem, Indchemie, Glenmark, Amerigen and Watson are "Generic Competitors").

5.      From October 2012 through November 2013, Forest entered into these serial deals pursuant to which each of the Generic Competitors agreed not to compete with Forest or enter the market prior to September 17, 2021, unless another generic competitor entered the market earlier:

| Settling Generic Competitor | Date of Settlement | Agreed Upon Delayed Entry Date |
|---|---|---|
| Hetero | October 24, 2012 | September 17, 2021 |
| Torrent | November 21, 2012 | September 17, 2021 |
| Alkem | November 27, 2012 | September 17, 2021 |
| Indchemie | November 27, 2012 | September 17, 2021 |
| Glenmark | December 21, 2012 | September 17, 2021 |
| Amerigen | July 18, 2013 | September 17, 2021 |
| Watson | November 6, 2013 | September 17, 2021 |

6.      In exchange, the Generic Competitors received "side-deals," and cash payments. While the precise amounts of the payments have not been publicly disclosed, on information and belief, the payments each exceed $15,000,000 in value.  As corporate successors to one or more of Defendants, Allergan and then AbbVie have continued this illegal collusion and unreasonable restraint of trade in the market for nebivolol HCl, all at the expense of Plaintiff and the proposed End-Payor Class.

2

7.    The only material difference between generic and brand name drugs is their price – generics are typically at least 50-80% less expensive when there are multiple generic competitors on the market.  As a result – and well understood by Forest and its successors – generic entry is (a) an opportunity for drug purchasers to obtain enormous cost savings; and (b) a serious threat to the monopoly power and profits of the manufacturer of the corresponding brand name drug, such as Defendants.

8.    AB-rated generics typically take 80% or more of the sales of a drug molecule from the brand name product within six months of generic entry.  These extremely rapid erosion rates of the brand manufacturer's sales are due in large part to a unique feature of the pharmaceutical industry called drug substitution laws, which permit (and in many states require) dispensing pharmacies to substitute available AB-rated generic drugs for a brand drug unless the prescribing physician specifically orders otherwise.

9.    Defendants' unlawful scheme succeeded.  Every month of delayed generic competition has allowed Forest and its successors to unlawfully maintain many millions of dollars in monopoly profits from Bystolic without generic competition and allowed the Generic Competitors to share in those profits by pocketing large and unjustified payments from Forest and its successors for agreeing to delay bringing generic nebivolol HCl to market.

10.    Beginning on December 17, 2011,[2] after the Generic Competitors became the first generic manufacturers to seek approval from the FDA to market generic Bystolic, Forest sued each of them, accusing them of allegedly infringing U.S. Patent No. 6,545,040 (the "'040 Patent"),

---

[2] *See, e.g.*, November 27, 2015 Letter from FDA to Watson,
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203683Orig1s000ltr.pdf;
May 27, 2017 Letter from FDA to Glenmark,
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/203821Orig1s000ltr.pdf;
June 24, 2015 Letter from FDA to Alkem,
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203741Orig1s000ltr.pdf.

which Forest successfully submitted for listing in the FDA Orange Book by certifying that the patent covered Bystolic. These suits, filed in mid-March 2012, automatically triggered stays of FDA approval of the generic products (meaning that regardless of the merits of the patent infringement actions, the FDA could not grant final approval to any of the Generic Competitors to launch a generic product before June 18, 2015 absent an earlier favorable decision for the Generic Competitors or a dismissal of the actions). And foreclosing the Generic Competitors from launching also foreclosed all other generic manufacturers; as the first manufacturers to file for approval for generic Bystolic, the Generic Competitors were eligible to share 180 days of market exclusivity, free from competition from other generic manufacturers (other than a generic marketed or authorized to be marketed by Forest, also known as an "authorized generic"), once they actually launched their generic versions of Bystolic.

11.     Between March 2012 and November 2013, while the stays were in effect, the Generic Competitors fought the patent infringement suits and prepared to bring their generic Bystolic to market to compete with Forest's branded Bystolic. At least six of the seven Generic Competitors would have been ready to launch well before September 17, 2021, as each had final FDA approval to do so as follows:

| Manufacturer | ANDA No. | Final Approval Date |
|---|---|---|
| Amerigen | 203659 | April 16, 2015 |
| Alkem | 203741 | June 24, 2015 |
| Indchemie | 203828 | July 29, 2015 |
| Watson | 203683 | November 27, 2015 |
| Glenmark | 203821 | May 25, 2017 |
| Torrent | 203966 | March 2, 2018 |

12.     The Generic Competitors would have succeeded in the patent litigation because the '040 Patent was weak. The '040 Patent litigation likely would have concluded by mid-2015, including all appeals. The Generic Competitors would have won and launched by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic,

4

U.S. Patent No. 5,759,580 (the "'580 Patent"), or (b) the date their ANDAs were finally approved. But rather than risk facing competition from the Generic Competitors as early as June 2015 and the subsequent reduction in Bystolic brand sales and revenues such competition would cause, Forest paid the Generic Competitors to stay off of the market until September 17, 2021.

13.     The side-deals that Forest provided to each Generic Competitor were intended to shield Forest from the risk of competition, and the Generic Competitors readily accepted these exclusionary side-deals to quit the patent fight.

14.     On February 18, 2014 Actavis PLC and Forest announced an equity and cash merger.[3]   On March 1, 2014 Forest's outside lawyers at Weil, Gotshal & Manges LLP were reviewing Forest's documents as part of their "work on the Actavis merger agreement."[4]   On March 4, 2014, Forest's outside lawyers informed Forest in-house counsel Eric Agovino via email (the "Agovino email") that "[b]efore we engage in any discussions with the FTC . . . we think it would be prudent for us to review all of the Bystolic settlement and licensing agreements *as well as the side agreements with those generic companies*."[5]   Agovino replied: "We entered into settlement agreements with the following defendants:

        1) Hetero

        2) Torrent

        3) Alkem

        4) Indchemie

---

[3] *See* Actavis to Acquire Forest Laboratories, Inc. for ~$25 Billion in an Equity and Cash Transaction, https://www.businesswire.com/news/home/20140218005877/en/Actavis-Acquire-Forest-Laboratories-25-Billion-Equity.

[4] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-RWL (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-44 at 332).

[5] *Id.* (emphasis added).

> 5) Glenmark
>
> 6) Amerigen
>
> 7) Actavis [Watson's successor]
>
> **All had side-deals** (one was struck with Alkem, which is a related company
> with Indchemie)."[6]

15.     Forest's Agreement and Plan of Merger with Actavis PLC (the "Merger
Agreement"), dated February 17, 2014 provides additional details.  Specifically, in the Merger
Agreement Forest disclosed its "material contracts," which are defined to include "any Contract
involving the settlement of any action or threatened action (or series of related actions) (A) which
will (x) involve payments after the date hereof of consideration in excess of $15,000,000 or (y)
impose monitoring or reporting obligations to any other Person outside the ordinary course of
business or (B) with respect to which material conditions precedent to the settlement have not been
satisfied."[7]

16.     Forest listed each of the side-deals as a "material contract" "in connection with the
settlement of BYSTOLIC patent dispute."

17.     Forest thus has described each of the side-deals set forth below as a "material
contract," *i.e.*, it was a "Contract involving the settlement of any action or threatened action (or
series of related actions) (A) which will (x) involve payments after the date hereof of consideration
in excess of $15,000,000 or (y) impose monitoring or reporting obligations to any other Person
outside the ordinary course of business or (B) with respect to which material conditions precedent
to the settlement have not been satisfied."  The respective contracts are set forth below.

---

[6] *Id*. (emphasis added).

[7] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-RWL (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 69).

| Generic Competitor | Settlement Agreement |
|---|---|
| Hetero | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012 . . . together with the FINAL TERM SHEET between Hetero Drugs Ltd. and Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."[8] |
| Torrent | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. dated November 21, 2012 . . . together with the PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[9] |
| Alkem/Indchemie | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012 . . . together with the TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute. AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT was executed on January 9, 2013" and "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Indchemie Health Specialties Private Ltd. dated November 27, 2012 . . . together with the TERM SHEET between Alkem Laboratories Ltd, Indchemie Health Specialties Private Ltd, and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute."[10] |
| Glenmark | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012 . . . together with the COLLABORATION AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[11] |

---

[8] *Id.* at 179.

[9] *Id.*

[10] *Id.*

[11] *Id.*

| Amerigen | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013 . . . together with the BINDING TERM SHEET COLLABORATION AGREEMENT between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."[12] |
|---|---|
| Watson | "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013 . . . together with (a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between Actavis, Inc. and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."[13] |

18.    Forest listed the side-deals in the Merger Agreement because, on information and belief, they "involve payments after the date [t]hereof of consideration in excess of $15,000,000."

19.    As Forest publicly acknowledged in the Agovino email, and in the Merger Agreement, the side-deals were entered into as part and parcel of Forest's patent settlement agreements with the Generic Competitors in the Bystolic patent litigation.

20.    In addition to the consideration Forest provided each Generic Competitor in the form of a side-deal, Forest "agreed to reimburse certain of the Settling Defendants' legal costs in connection with the patent litigation."[14]

21.    Forest also disclosed that its settlement agreements with the Generic Competitors "provide[d] a license to each of the Settling Defendants that will permit them to launch their respective generic versions of Bystolic as of the date that is the later of (a) three calendar months prior to the expiration of the '040 patent, including any extensions and/or pediatric exclusivities or

---

[12] *Id.*

[13] *Id.* at 180.

[14] https://www.sec.gov/Archives/edgar/containers/fix010/38074/000003807413000024/R17.htm.

(b) the date that each Settling Defendant receives final FDA approval of its ANDA, *or earlier in certain circumstances*."[15] This bolded language typically refers to what is known as a "contingent launch provision" ("CLP"), or an "acceleration clause." CLPs ensure a settling generic that it will not be competitively disadvantaged should a later settling generic negotiate an earlier licensed entry date or otherwise come to market earlier: pursuant to the CLPs the entry date may be "accelerated" permitting the settling generic to enter the market at the same time as any of its competitors. CLPs ensure settling generic ANDA filers that, if any other ANDA filer somehow makes it to market before the agreed-upon licensed entry date, that ANDA filer's licensed entry date would be accelerated so that it could launch at the same time.

22.    When CLPs are used, they generally operate the same way in each ANDA filer's settlement agreement.  Under a CLP, the first-filing ANDA filer (or, as here, filers) obtains protection from other first filers by agreeing to delay the launch of their generic products from the date of settlement until a date certain (here, exactly three months before the expiration of the '040 Patent),[16] but *if and only if* all other first-filer generic companies follow suit. By brokering the agreements, Forest ensured that its would-be competitors would drop their '040 Patent fight and Bystolic would have no generic competitors while Forest would maintain its unlawfully-generated monopoly profits until at least September 17, 2021.

23.    Reverse-payment agreements like the side-deals in this case delay the entry date for generic drug products beyond the date when competition would ensue in the absence of a reverse payment.  As the United States Supreme Court put it, "An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that

---

[15] *Id*. (emphasis added).

[16] *Id*.

fact, in turn, suggest that the payment's *objective* is to maintain supracompetitive prices . . . ." *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013). Without the ability to offer or accept an unlawful reverse-payment, Forest and the Generic Competitors would have instead agreed upon an earlier licensed entry date for generic versions of Bystolic. And, because of the CLPs, if *just one* of the Generic Competitors did not take an unlawful payment, and instead insisted on an earlier entry date untainted by a side-deal, *every other* Generic Competitor would enter on the same earlier date.

24. But for the anticompetitive reverse-payments, the Generic Competitors would have launched their generic products earlier either: (a) at risk; or (b) upon prevailing against Forest in the underlying patent litigation; or (c) via lawful settlement agreements providing for earlier negotiated entry dates untainted by the delay caused by the unlawful reverse-payments.

25. Had any of the above scenarios played out – as would have occurred absent the unlawful reverse-payments – Plaintiff and the proposed End-Payor Class it seeks to represent (defined below) would have paid substantially less for nebivolol HCl.

26. Defendants' conduct was designed to, did, and continues to: (a) delay the entry of less expensive, AB-rated generic versions of Bystolic; (b) fix, raise, maintain or stabilize the price of nebivolol HCl; and (c) allocate 100% of the United States market for nebivolol HCl to themselves until three months before expiration of the '040 Patent.

27. Defendants' monopoly power in the nebivolol HCl market was maintained through willful exclusionary conduct, as distinguished from growth or development as a consequence of a legally-obtained valid patent, other legally-obtained market exclusivity, a superior product, business acumen, or historical accident.

28.     Plaintiff brings this action as an end-payor purchaser of Bystolic, on its own behalf and on behalf of all similarly situated end-payor purchasers.  As alleged below, Defendants' unlawful conduct injured Plaintiff and the proposed End-Payor Class Plaintiff seeks to represent by preventing generic nebivolol HCl manufacturers from entering the market with competing generic products and has cost Plaintiff and the proposed End-Payor Class hundreds of millions of dollars in overcharge damages.

29.     Plaintiff and the proposed End-Payor Class seek to recover damages, including treble damages, under the state antitrust, unjust enrichment and consumer protection laws enumerated below as well as injunctive relief.

## II.     JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the putative class is a citizen of a state different from that of one of Defendants.

31.     This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

32.     Venue is appropriate within this District under 28 U.S.C. § 1391.  Defendants transact business within this District and/or have agents in and/or that can be found in this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

33.    Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

34.    During the class period, Defendants manufactured, sold and shipped Bystolic in a continuous and uninterrupted flow of interstate commerce. Defendants' anticompetitive conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

35.    During the class period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their scheme.

36.    The Court has personal jurisdiction over each of Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at and has had the intended effect of causing injury to individuals and companies residing in or doing business throughout the United States, including in this District. Personal jurisdiction also lies under Fed. R. Civ. P 14(k)(2) over the foreign domiciliary defendant.

### III.    THE PARTIES

37.    Plaintiff Teamsters Local No. 1150 Prescription Drug Benefit Plan maintains its principal place of business in Wallingford, Connecticut. Plaintiff provides prescription drug benefits to its union members, plus their spouses and dependents. During the Class Period, as defined below, Local 1150 purchased, paid, and/or provided reimbursement for some or all of the purchase price of Bystolic for personal and/or household use in Alabama, Connecticut, Florida and Massachusetts. Local 1150 paid more than it would have absent Defendants' unlawful anticompetitive scheme to prevent generic entry and was injured as a result of the illegal and wrongful conduct alleged herein. Local 1150 intends to continue purchasing, paying for, and/or

12

providing reimbursement for Bystolic and will be injured as a result of Defendants' ongoing unlawful conduct.

38.    Defendant Forest Laboratories, Inc. is a Delaware corporation having its principal place of business at 909 Third Avenue, New York, New York 10022.

39.    Defendant Forest Laboratories Ireland, Ltd. is an Irish Corporation with a place of business at Clonshaugh Industrial Estate, Dublin 17, Ireland.

40.    Defendant Forest Laboratories Holdings, Ltd. is a Bermudian corporation having a principal place of business at 18 Parliament Street, Hamilton HM 11, Bermuda.  In or around February 2006, Defendant Forest Laboratories Ireland, Ltd. changed its name to Forest Laboratories Holdings, Ltd. and changed its residence from Ireland to Bermuda.[17]

41.    Defendant Forest Laboratories, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.  On July 1, 2014, in a series of transactions, Forest Laboratories, Inc. became a limited liability company named Forest Laboratories, LLC.  On July 1, 2014, Actavis PLC ("Actavis") acquired Defendant Forest.  On May 17, 2015 Actavis acquired Defendant Allergan, Inc. but maintained the name Allergan for its ongoing operations.  Subsequently, on January 1, 2018, Forest Laboratories, LLC was merged with and into Defendant Allergan Sales, LLC, a Delaware limited liability company.  As a result of these corporate consolidations, the Forest Defendants are predecessors in interest to Allergan Sales, LLC.

42.    Defendant Allergan Sales, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

---

[17] *See, e.g.*, Notice and Stipulation of Name Change, *Forest Lab., et al. v. Ivax Pharm., Inc., et al.*, 03-cv-00891 (D. Del. Feb. 8, 2006) (ECF No. 536).

43.     Defendant Allergan, Inc. is a Delaware corporation with its principal place of business located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

44.     Defendant Allergan USA, Inc. is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

45.     Allergan, through its merger with Forest, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those provisions, and benefited from making sales of Bystolic to Plaintiff and members of the proposed Class at the supracompetitive prices made possible by the delay those challenged provisions produced.[18]

46.     On information and belief, Forest assigned the reverse-payment agreements to Allergan, and Allergan never withdrew from them.

47.     On information and belief, Allergan joined the ongoing unlawful course of conduct and joined the unlawful reverse-payment agreements – with respect to the suppression of generic competition for Bystolic. Allergan did not withdraw from those conspiracies and instead continued to participate in them.

48.     Defendant AbbVie, Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064.

49.     AbbVie is the corporate successor to Allergan and Forest, having completed its purchase of Allergan on May 8, 2020.

---

[18] *See, e.g.*, Bystolic label, available at https://www.dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=8b8ad213-1dc8-454e-a524-075685c0e1a8 (listing Allergan, Inc. as the distributor of Bystolic).

50.    Defendant AbbVie, through its merger with Allergan, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those provisions, and benefited from manufacturing and selling Bystolic at the supracompetitive prices made possible by the delay those challenged provisions produced.

51.    On information and belief, Allergan assigned the reverse-payment agreements to AbbVie, and AbbVie never withdrew from them.

52.    On information and belief, AbbVie joined the ongoing unlawful course of conduct and joined the unlawful reverse-payment agreements – with respect to the suppression of generic competition for Bystolic. AbbVie did not withdraw from those conspiracies and instead continued to participate in them.

53.    Defendants' wrongful actions described in this complaint are part of, and were taken in furtherance of the illegal monopolization scheme and restraint of trade alleged herein. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment and with their actual, apparent, or ostensible authority.

## IV.    UNNAMED (AS DEFENDANTS) CO-CONSPIRATORS

54.    The Generic Competitors, Hetero, Torrent, Alkem, Indchemie, Glenmark, Amerigen and Watson, are generic drug manufacturers and entered into the illegal agreements with Defendants from October 2012 through November 2013, which agreements are the subject of this complaint.  The Generic Competitors each initiated and participated in the unlawful conspiracy described in this complaint, although each is not named as a defendant in this complaint.

55.     All of the unnamed (as defendants) co-conspirators' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or undertaken by the unnamed co-conspirators' various officers, agents, employees, or other representatives while actively engaged in the management of the unnamed co-conspirators' affairs within the course and scope of their duties and employment and with their actual, apparent, or ostensible authority.

### V.    ECONOMIC BACKGROUND

56.     The marketplace for the sale of prescription pharmaceutical products in the United States is unusual.  In most industries, the person who pays for a product is also the person who chooses the product.  When the same person has both the payment obligation and the choice of products, the price of the product plays a predominant role in the person's choice of products.  Consequently, manufacturers have a strong incentive to lower the price of their products to maintain profitability.

57.     The pharmaceutical marketplace, in contrast, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing certain drugs to patients unless they can present a prescription written by their physician.  This prohibition introduces an anomaly into the pharmaceutical marketplace between the payment obligation and the product selection.  The patient (or his or her insurer) has the obligation to pay for the pharmaceutical product, but his or her doctor chooses which product the patient will buy.

58.     In 1984, Congress sought to ameliorate the "disconnect," by authorizing the manufacture and sale of generic pharmaceuticals under the Hatch-Waxman Act, discussed further

below.  Now, when a pharmacist receives a prescription for a branded drug and an AB-rated[19] generic version of that drug is available, state laws require the pharmacist to dispense the generic instead of the brand.  In this way, price is reintroduced to the product selection decision at the pharmacy counter, and the pharmaceutical marketplace "disconnect" is lessened.  When an AB-rated generic equivalent is introduced and not prevented from competing, brand manufacturers can no longer exploit the "disconnect," their monopoly power dissipates, and some of the normal competitive pressures are restored.

59.    Because AB-rated generic versions of brand-name drugs contain the same active ingredients and are determined by the FDA to be just as safe and effective as their branded counterparts, the only material differences between generic drugs and their branded counterparts are their prices and manufacturers.  Because AB-rated generic versions of branded products are commodities that cannot otherwise be differentiated, the primary basis for generic competition is price.

60.    Typically, generics are 50% to 80% (or more) less expensive when there are multiple generic competitors on the market for a given brand.  Consequently, the launch of a bioequivalent generic drug usually results in significant cost savings to all drug purchasers.

61.    The combination of these factors — the regulatory interchangeability of bioequivalent generics for the brand, state substitution laws, margin incentives of pharmacies, and the like — results in the typical phenomenon that once a brand drug "goes generic," the product swiftly moves from a monopoly priced to a commodity priced item.

---

[19] AB-rated generic versions of brand name drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective as their brand name counterparts.  Every state either requires that a prescription written for the brand drug be filled with an AB-rated generic, unless there are "Dispense as Written" instructions to the contrary.

62.    Generic competition enables all members of the proposed Class to purchase generic versions of the drug at substantially lower prices and to purchase the brand drug at a reduced price.

63.    The Hatch-Waxman Act has significantly advanced the rate of generic drug launches while also ushering in an era of historically high profits for brand drug manufacturers. In 1983, before the Hatch-Waxman Act, only 35% of the top-selling branded drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, annual prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total annual prescription drug revenue had soared to $300 billion.

64.    The Federal Trade Commission ("FTC") estimates that about one year after market entry, a generic drug takes over 90% of the branded drug's unit sales at 15% of the price of the branded drug.  As a result, brand drug manufacturers view competition from generics as a grave threat to their bottom lines.

65.    When a brand drug faces generic drug competition, purchasers are able to (a) purchase generic versions of the drug at much lower prices; and/or (b) purchase the brand drug at a reduced price.  Until the generic version of a brand drug enters the market, however, there is no bioequivalent generic to substitute for, and compete with, the branded drug, so the brand manufacturer can continue to profitably charge supracompetitive prices.[20]  As a result, brand drug manufacturers, well aware of the rapid erosion of brand drug sales by generics, have a strong

---

[20] The price of brand Bystolic has increased substantially over the last five years.  Defendants increased the price of the 10 mg tablet of Bystolic by 8.5% in October 2015, 9% in April 2016, 9% in January 2017, 9.5% in January 2018, 9.5% in January 2019, and 5% in January 2020 – in total increasing the price of the 10 mg tablet of Bystolic by 62% over the last five years.  Defendants took nearly identical price increases on the other strengths of Bystolic, increasing the prices of the various strengths of Bystolic by 60-62% over the period from June 2015 through today.

incentive to delay the start of generic drug competition.  Brand manufacturers often seek to extend their monopolies by any means possible, sometimes even resorting to illegal ones.

## VI.    REGULATORY BACKGROUND

### A.    The Hatch-Waxman Amendments.

66.    The Hatch-Waxman amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly New Drug Applications ("NDA(s)").[21]  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must further show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and that it is bioequivalent, *i.e.*, absorbed at the same rate and to the same extent as the brand.  The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

67.    The Federal Food, Drug, and Cosmetics Act ("FDCA") and Hatch-Waxman amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[22]

---

[21] *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355).

[22] 21 U.S.C. § 355(j)(8)(B).

68.     Through the Hatch-Waxman amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

69.     The Hatch-Waxman amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers.  In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[23]  Generics are dispensed about 95% of the time when a generic form is available.[24]

**B.      Regulator Exclusivities for New Drugs.**

70.     In order to promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman amendments also provided for exclusivities (or exclusive marketing rights) for new drugs.  These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met.  These exclusivities are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

71.     One such exclusivity, New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by the FDA either alone or in combination.  If a product receives NCE exclusivity, the FDA may not accept for review any ANDA for a drug containing the same active moiety for five years from the date of the NDA's

---

[23] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014).

[24] *Id.* at 51.

approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[25]

72.    A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application.  If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.[26]

73.    Regulatory exclusivities are not always absolute bars to generic entry.  For example, some can be overcome by carving out information in the label or for other reasons.[27]

## C.    ANDA Paragraph IV Certifications.

74.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman amendments, a generic manufacturer's ANDA must contain one of four certifications:

a.    That no patent for the brand has been filed with the FDA (a "paragraph I certification");

b.    That the patent for the brand has expired (a "paragraph II certification");

c.    That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

d.    That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[28]

---

[25] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

[26] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).

[27] *See*, *e.g.*, 21 C.F.R. §§ 314.94(a)(8)(v), 314.127(a)(7); 21 U.S.C. § 355a(o).

[28] 21 U.S.C. § 355(j)(2)(A)(vii).

75.    If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years, or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[29]  Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval).  The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

**D.    The First Filer's 180-day Exclusivity Period.**

76.    Generics may be classified as (i) first-filer generics, (ii) later generic filers, or (iii) authorized generics.

77.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman amendments grant the first paragraph IV ANDA filer ("first filer") a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.[30]  That is, when a first filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed

---

[29] 21 U.S.C. § 355(j)(5)(B)(iii).  This period is commonly called a "30-month Hatch-Waxman stay" or "30 month stay."  The brand/ patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic launch.

[30] 21 U.S.C. § 355(j)(5)(B)(iv), (D).

by the generic, the FDA cannot approve a later generic manufacturer's ANDA until the first generic has been on the market for 180 days.[31]

78.     The 180-day window is often referred to as the first filer's six month or 180-day "exclusivity;" this is a bit of a misnomer, because a brand manufacturer (such as Defendants) can launch an authorized generic ("AG") at any time, manufacturing its AG in accordance with its approved NDA for the branded product but selling at a lower price point.  Brand manufacturers frequently launch AGs in response to generic entry in order to recoup some of the sales they would otherwise lose.

79.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[32]

80.     A first filer that informs the FDA it intends to wait until all Orange Book-listed patents expire before marketing its generic does not get a 180-day exclusivity period.  Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

**E.     Patents Are Not Bulletproof.**

81.     Patents are not bulletproof.  Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the United States Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.  A patent holder at all times bears the burden of proving infringement.

---

[31] Or, until its first-filer exclusivity has been forfeited.  A first filer can forfeit its 180-day exclusivity by, for example, failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA.  There is no forfeiture here.

[32] *Actavis, Inc.*, 133 S. Ct. at 2229 (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).

82.     One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

83.     A patent is unenforceable when it claims a product that is patentably distinct from the allegedly infringing product.

84.     In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

85.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[33] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[34]

**F.     The Competitive Effects of AB-Rated Generic Competition.**

86.     Generics contain the same active ingredient(s) and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between

---

[33] FTC, *Generic Drug Entry Prior to Patent Expiration: AN FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

[34] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

generics and their corresponding brand versions is their price. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a branded product and its generic version, or between generic versions, is price. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers, especially end-payor purchasers.

87.     Thus, conduct that delays generic entry harms end-payor purchasers (like Plaintiffs and the proposed Class members here) in several ways. One way that end-payor purchasers are harmed (suffer overcharges) is that they are forced to continue purchasing the more expensive brand drug instead of the lower-priced generic equivalent they would have purchased had the generics entered earlier. In addition, conduct that delays generic entry causes end-payor purchasers to pay inflated generic prices because (a) generic prices fall over time, and so generic prices would have been lower if generic competition had started earlier; and (b) brand prices typically increase over time and the generic price is discounted off of the brand price, and so the generic prices would have been lower if the generics had launched earlier, when the brand price was lower (since the generic price would have been discounted off of the lower brand price).

88.     Since the passage of the Hatch-Waxman amendments, every state has adopted drug product selection laws that require pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitutions are not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic enters the market, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. In a recent study, the FTC found that on average, within a year of

generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[35]  As a result, competition from generics is viewed by brand manufacturers, such as Defendants, as a grave threat to their bottom lines.

89.    Generic competition enables all purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price.

90.    Until a generic version of the brand enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand and the brand manufacturer can therefore continue to profitably charge supracompetitive prices.  Brand manufacturers, such as Defendants, are well aware of generics' rapid erosion of their brand sales.  Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

### 1.    The first AB-rated generic is priced below the brand.

91.    Experience and economic research show that the first generic manufacturer to market its product prices it below the prices of its brand counterpart.[36]  Every state requires or permits that a prescription written for the brand be filled with an AB-rated generic.  Thus, the first generic manufacturer almost always captures a large share of sales from the brand.  At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

---

[35]  *See* FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

[36]  FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact ii-iii, vi, 34 (2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-    term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-    short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); FTC Pay-for-Delay Study at 1.

92.     During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market (though the brand's AG can be, and often is, on the market during the 180-day exclusivity period), and a first-filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

### 2.     Later generics drive prices down further.

93.     Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other on price, driving prices down toward the marginal manufacturing costs.[37]

94.     According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price.

95.     In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[38] In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[39]

---

[37] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 Int'l J. Indus. Org. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 New Eng. J. Med. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & Econ. 311 (2000).

[38] FTC 2011 AG Study at 66-67.

[39] *See* Generic Drugs: Questions and Answers, FDA, http://www.fda.gov/drugs/resourcesfor you/consumers/questionsanswers/ucm100100.htm (last visited September 9, 2019).

**G.    Pharmaceutical Manufacturers Can Game the Regulatory Structure in Order to Impair Competition.**

96.    When they do not face generic competition, brand manufacturers can usually sell the brand far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales.  The ability to make those kinds of profit margins is what economists call market power.  When generics enter the market, however, they quickly take 80% or more of the unit sales.  And when multiple generics are in the market, the competition between the generics drives their prices to near the marginal cost of production. This competition puts an end to the brand manufacturer's market power and delivers enormous savings to drug purchasers.

97.    Brand and first-filer generic manufacturers have a collective interest in preventing this competition from breaking out.  If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits among themselves.  They can keep for themselves the enormous savings that competition would have delivered to drug purchasers.

98.    A brand manufacturer in the marketplace without competition from generics gets all of the profits on all of the unit sales.

99.    When generic entry occurs, the brand manufacturer loses most of the unit sales; generic manufacturers sell most of the units, but at drastically reduced prices; and competition delivers enormous savings to drug purchasers.  Competition converts what formerly were excess profits into purchaser savings.

100.    To prevent this from happening, brand and generic manufacturers sometimes – unlawfully – agree to not compete and instead split the purchaser savings between themselves.

28

101.    Figure 1 compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (*i.e.*, with only an agreed entry date and without a pay-off to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed generic entry date for the generic is earlier and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later and the brand manufacturer's profits increase significantly. Earlier entry may also occur if the generic manufacturer launches its product at risk (*i.e.*, while the litigation is still pending) or prevails in the patent litigation and then launches its product.



Figure 1: Impact of Delay on Brand Profits

102.    In order for such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide the purchaser savings between themselves. The generic manufacturer will not refrain from competing if it does not share in the ill-gotten gains through some means. Pay-offs from the brand manufacturer are the means by which brand and generic

manufacturers divide between themselves the ill-gotten gains that delayed competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

103.    The brand manufacturer may choose to – unlawfully – pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its drug also prevents other generic manufacturers from marketing their products.

104.    Later ANDA filers have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

105.    In the absence of an anticompetitive agreement between the brand company and the first filer, later ANDA filers have procompetitive incentives. They are motivated to expend resources to challenge the brand manufacturer's patent(s) (knowing that the first-filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

106.    When an anticompetitive agreement with the first filer is already in place, however, pursuing the litigation to conclusion becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand manufacturer's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive reverse payment agreement). The later generics have to bear the brunt of the litigation costs themselves and, upon prevailing in the patent litigation, expect to face competition from at least the first-filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand

and first-filer generic (such as the first to file Generic Competitors' and Defendants' agreements at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well – greatly reducing the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

107.    Thus, some later generics decide to simply give in to or join the conspiracy between the brand manufacturer and the first-filer generic and agree to drop their challenges to the brand manufacturer's patent(s) and stay off the market until after entry by the first filer.

108.    Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

1.    **Side deals provide a means for manufacturers to share the gains from conspiring.**

109.    In the past, reverse-payment agreements often took the form of a straight cash payment from the brand name manufacturer to the generic competitor. As these payments attracted regulatory scrutiny, congressional investigations, and class action lawsuits, brand name manufacturers and generic competitors have entered into increasingly elaborate agreements in an attempt to mask the fundamentally anticompetitive character of their agreements. For example, the reverse-payment deals that were the subject of *Actavis* involved payments allegedly hidden in co-promotion and manufacturing side-deals entered into in connection with settlement of patent litigation over the brand drug AndroGel. Because the profits to be gained by delaying generic competition are so great, however, drug manufacturers retain the incentive to enter into such agreements.

31

110.    Thus side deals are a form of payment actionable under *Actavis* and are anticompetitive.[40]

111.    The Federal Trade Commission also agrees that side deals may be suspect and evidence of an antitrust violation.  An FTC official has taken the position that contemporaneous side deals prompt "the question of whether the deal is designed to persuade the generic to give up an earlier entry date."[41]

## VII.    FACTS

### A.    Basic Chemistry Relating to the Active Pharmaceutical Ingredient in Bystolic.

112.    Molecules are composed of atoms (*e.g.*, carbon, nitrogen or hydrogen) that are bonded to each other through the sharing of electrons.  The atom carbon forms four bonds and tends to adopt a tetrahedral structure.  That three-dimensional arrangement can be envisioned as a tetrahedron with the carbon atom at the center and the four substituents at the four vertices of the tetrahedron.

113.    The chemical symbol for a carbon atom is "C."  The figure below depicts a carbon atom (labeled as "C") bonded to four different chemical substituents (labeled as "$X_1$," "$X_2$," "$X_3$," and "$X_4$").  The straight lines from the carbon atom (at the center) to "$X_1$" and "$X_4$" are intended to convey that they are in the plane of the page.  The solid wedge from the carbon atom to "$X_3$" is intended to convey that it is coming out of the page towards the reader.  The hashed wedge from

---

[40] *See also* A. Edlin *et al.*, "Activating Actavis," Antitrust, 28(1), Fall 2013, pp. 16-23, particularly p. 18, also noting that "Ordinarily, a genuinely valuable fee-for-service deal could be kept separate from the settlement to avoid antitrust problems.  A degree of skepticism is therefore warranted with regard to complex reverse-payment settlements where the parties justify the large payments by subsidiary consideration."; C.S. Hemphill, "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," Columbia L. Rev., 109(4), 2009, pp. 629-687, particularly pp. 666-668, observing that side deals between brand and generic firms are infrequent outside of patent settlements and that "the overall pattern [of the side deals] suggests they provide a disguised means to confer payment."  *Id.* at 633.

[41]  M. Lipman, "FTC Official Says Patent Settlement Side Deals Suspicious," *Law360*, April 16, 2015, available at http://www.law360.com/articles/644134/ftc-official-says-patent-settlement-side-deals-suspicious.

the carbon atom to "$X_2$" is intended to convey that it is coming out of the page but away from the reader. Thus, the below figure reflects a three-dimensional tetrahedral structure with a carbon atom at its center.



114. When a carbon atom is attached to four different substituents in a tetrahedral arrangement such as that shown above, the substituents can be arranged in either of two conformations, as depicted below, with a mirror line between them. Note that, much like one's left and right hands, these two arrangements (see below) are mirror images of one another. And much like one's left and right hands, they cannot be superimposed on one another by rotation. A carbon atom bonded four different substituents can thus exist as either of two "stereoisomers" and such a carbon atom is referred to as a "chiral center." Naming conventions exist to distinguish these two stereoisomers from one another, and a commonly used terminology refers to one configuration as the "R" configuration and the other as the "S" configuration.

33



115.    Distinguishing between stereoisomers can be particularly important in biological systems because many active pharmaceutical ingredients ("APIs") in drugs interact with naturally occurring receptors in the human body by fitting into a three-dimensional site on the receptor, much like a left hand fits into a left-handed glove.  Just as a left hand would not fit properly into a right- handed glove, the wrong stereoisomer often will not fit into the intended receptor site.  Thus, it is not uncommon for one stereoisomer to exhibit a desired pharmacological activity in biological systems while the other does not.

116.    Carbon is so ubiquitous in organic chemicals that a carbon atom in chemical structures is often abbreviated as a vertex, rather than as a "C," with the understanding that such vertices are carbon.   The chemical symbol for hydrogen is "H" and hydrogen only forms one bond.  Because hydrogen is also ubiquitous and the number of chemical bonds that carbon and hydrogen make (*i.e.*, 4 and 1, respectively) is so well known, hydrogen is often omitted from chemical structures and its presence is assumed when a carbon has less than four bonded substituents.

34

117.    On March 31, 1987, the United States Patent and Trademark Office ("PTO") issued United States Patent No. 4,654,362 ("the '362 Patent"). The '362 Patent disclosed a number of different chemical compounds, including the following chemical compound:



118.    The unlabeled vertices above correspond to a carbon atom and each of those carbon atoms (vertices) is connected to other atoms.  To the extent a particular carbon atom has less than four bonds depicted, the remainder are hydrogen atoms.  With this understanding in mind, each asterisk in the above chemical structure corresponds to a chiral center – *i.e.*, a carbon atom bonded to four different substituents – that can adopt either of two configurations that can be labeled as either an "R" or "S" configuration.  As a result, the above chemical structure discloses ten different possible stereoisomers with the following configurations:

|              |               |
|--------------|---------------|
| 1. SRRR      | 6. SRSS       |
| 2. RSSS      | 7. RSRR       |
| 3. SRRS      | 8. RRSS       |
| 4. RSSR      | 9.  SSSS      |
| 5. SRSR      | 10. RRRR      |

119.    Forest was, and its successor in interest Allergan is, the holder of NDA No. 21-742 for Bystolic.  The active ingredient in Bystolic is a mixture of two of the above ten stereoisomers: the SRRR and RSSS stereoisomers (*i.e.*, nos. 1 and 2, above).  The mixture of these two stereoisomers is referred to as nebivolol, and both are present in Bystolic as a hydrochloride salt.

35

**B.    Forest's Bystolic Patents.**

120.    Forest certified to FDA that the '040 and '580 Patents covered Bystolic, and FDA listed those patents in the Orange Book.  The '580 Patent issued on June 2, 1998 and expired seventeen years later, on June 2, 2015.  Accordingly, the '580 Patent afforded Forest no protection from generic competition for Bystolic beyond June 2, 2015.

121.    The '040 Patent issued from United States Application Serial No. 07/825,488 ("the '488 Application") filed on January 24, 1992.  To understand the impact of prosecution of the '488 Application at the PTO on the scope of the issued claims in the '040 Patent, it is important to understand the effect of the choice of transition in a patent claim.  "A patent claim typically has three parts: the preamble, the transition, and the body."[42]  "The preamble is an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties."[43] "The transition is a phrase connecting the preamble to the body of the claim.  The content of the phrase may indicate whether the elements stated in the body are 'open' or 'closed.'"[44]  "The body of the claim is the recitation or listing of the elements and limitations which define the product or process to be encompassed within the patent monopoly."[45]

122.    There are three commonly used transitional phrases: "comprising," "consisting of," and "consisting essentially of."[46]  These are "terms of art in patent law that 'define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim.'"[47]  At one end of the spectrum, the phrase "comprising" signifies that the

---

[42] Donald S. Chisum, CHISUM ON PATENTS § 8.06[1](b) (2003).

[43] *Id*. § 8.06[1](b)[i].

[44] *Id*. § 8.06[1](b)[ii].

[45] *Id*. § 8.06[1](b)[iii].

[46] *Id*. § 8.06[1](b)[ii]; *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006).

[47] *Id*. (quoting the Manual of Patent Examining Procedures).

claim is "open" to the addition of unrecited components or steps.[48]  For example, a claim reciting a product "comprising" three ingredients A, B and C encompasses a product composed of A, B, C and D (*i.e.*, the addition of D to the A-B-C combination does not avoid infringement).

123.    The originally-filed claims in the application that issued as the '040 Patent employed the open transition "comprising."  For example, originally-filed claim 19 covered pharmaceutical compositions "comprising" a "pharmaceutically acceptable carrier" and the SRRR and RSSS stereoisomers of nebivolol.  The use of the open transition "comprising" meant that original claim 19 covered formulations having the SRRR and RSSS stereoisomers of nebivolol, even if the formulations also included some or all of the other eight unclaimed stereoisomers of nebivolol.  The PTO examiner therefore rejected those claims based upon the prior art '362 Patent described above.  The examiner reasoned that the '362 Patent taught mixtures of various of the stereoisomers described above, and thus were covered by pending claim 19.

124.    In response, the applicants admitted that the '362 Patent taught "undefined mixtures that may include the presently claimed compounds in admixture with other stereoisomers of the Base Compound. . . ."  More specifically, the applicants admitted that "Compound 84 . . . is an undefined mixture of the RSRS, RSSR, and SRRS isomers."  In an attempt to overcome the rejection, the applicants narrowed the claims by substituting new claims utilizing the transition "consisting essentially of" rather than "comprising."  In doing so, the applicants emphasized that the purpose of the amendment was to distinguish their claims from the undefined mixtures of other nebivolol isomers disclosed in the Prior Art '362 Patent:

> Claims 18 and 19 have been rewritten as new Claims 25 and 26. Claim 25 recites "A composition consisting essentially of the compound . . .", and Claim 26 recites "A pharmaceutical composition consisting essentially of . . . [the two compounds (a) and (b)]". This amendment is being made to more

---

[48] *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007).

clearly distinguish the claimed invention over the prior art ['362 Patent] which, as is explained in detail below, discloses undefined mixtures that may include the presently claimed compounds in admixture with other stereoisomers of [nebivolol]. Favorable consideration of the amended claims is respectfully requested.

125.    The transition "consisting essentially of" in a patent claim narrows the claim relative to "comprising."[49]  "[W]ith respect to a 'consisting essentially of' claim, there is no infringement where the accused product contains additional, unclaimed ingredients that materially affect the basic and novel properties of the invention."[50]  Thus, for a claim reciting a product "consisting essentially of" ingredients A, B and C, the addition of unrecited ingredient D will avoid infringement if D has a material effect on the basic and novel properties of the claimed invention.

126.    The PTO examiner, however, was not persuaded that the use of the "consisting essentially of" transition distinguished the then-pending claims from the '362 Patent.  He therefore maintained his rejection of the claims.  The applicants for the '040 Patent again argued that it was impossible to tell from the '362 Patent which stereoisomers, and in what amounts, were definitely present in the disclosed mixtures:

There is no way that one can determine from the teachings of the patent the specific stereoisomeric configuration of [the prior art '362 Patent's] compound Nos. 84 and 87.

The Examiner continued to maintain his rejections and ultimately issued a final rejection of the "consisting essentially of" Claims 25 and 26, as anticipated by the '362 Patent.  He also rejected the claims as obvious.

127.    The applicants for the '040 Patent appealed the examiner's final anticipation and obviousness rejections to the Board of Patent Appeals and Interferences ("the Board").  In their

---

[49] *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1239 (Fed. Cir. 2003).

[50] *Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1320-21 (Fed. Cir. 2006).

brief, the applicants continued to argue that it was impossible to say exactly which stereoisomers (and how much of them) were present in Compound 84 of the prior art '362 Patent, but that the "possible" stereoisomers present in unknown amounts were RSRR, RSSS, SRRR and SRSS. During the course of briefing the appeal to the Board, the Examiner dropped the anticipation rejection.

128.    The Board nevertheless addressed the anticipation issue and made certain findings and conclusions regarding the relationship between then-pending Claim 26 and Compound 84 of the '362 Patent. Specifically, the Board concluded: [The '362 Patent's] disclosure of compound 84, together with its designation "AB," appears to describe the individual RSSS, SRRR, RSRR and SRSS stereoisomers "just as surely as if they were identified in the reference by name."

129.    The Board then determined that the "consisting essentially of" transition in then-pending Claim 26 caused the claim to cover the undefined mixture of isomers in the Prior Art '362 Patent:

> It is well settled that "the phrase 'consisting essentially of' limits the scope of a claim to the specified ingredients and those that do not materially affect the basic and novel characteristic(s) of a composition." Here, a basic and novel characteristic of the pharmaceutical composition of claim 26 is its blood pressure reducing or antihypertensive effect. Thus, claim 26 is open to ingredients that do not materially affect its antihypertensive activity. [The prior art '362 Patent's] antihypertensive compound 84 is a mixture of four stereoisomers: RSSS, SRRR, RSRR and SRSS. Because the RSSR and SRSS stereoisomers do not materially affect blood pressure reducing or antihypertensive activity, it appears that they are not excluded from the **composition of claim 26**. (internal citation omitted and emphasis added).

Accordingly, the Board ordered the Examiner to reconsider his withdrawal of the anticipation rejection based on the Prior Art '362 Patent:

> Specifically, the examiner should consider whether claim 26 'reads on' [the '362 Patent's] compound 84 taking into account the appropriate principles of claim interpretation and the foregoing remarks.

39

The very clear upshot of the Board's decision was that the claims of the '488 Application were not patentable unless the claims excluded the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers.

130.    On remand from the Board, the applicants for the '040 Patent did not even attempt to argue against anticipation in view of the Board's opinion. Instead, they further narrowed their claims by replacing "consisting essentially of" with "consisting of," in new Claims 27 and 28. And based on that change, applicants argued that the new "consisting of" limitation excluded the undefined mixture of possible stereoisomers in the '362 Patent: Applicants respectfully submit that the claims, as amended, are patentable over [the prior art '362 Patent].

> Applicants submit that neither a composition consisting of the RSSS enantiomer, nor a composition consisting of the RSSS enantiomer and its enantiomer the SRRR enantiomer, are disclosed in [the '362 Patent]. [The '362 Patent] discloses the base compound, as an undefined mixture of stereoisomers, as compound 84 (designated as "AB") and 87 (designated as "AA"), shown in the table in Col. 21 of the patent.

131.    Once again, the applicants expressly noted that "Compound 84 [of the prior art '362 Patent] is an undefined mixture of the RSRR, RSSS, SRSS and SRRR isomers, and Compound 87 [] is an undefined mixture of the RSRS, RSSR, and SRRS isomers." They argued that the new "consisting of" language excluded compounds containing such additional isomers:

> [I]t is clear that the cited [the '362 Patent] discloses neither a composition consisting of the RSSS enantiomer of the base compound, nor a composition consisting of the RSSS and SRRR enantiomers.

132.    And again, applicants did not distinguish their claims based on any particular amount or source of possible unrecited stereoisomers in the "undefined mixture" of the '362 Patent.

133.    The phrase "consisting of" is the narrowest of the transitions and it "signifies restriction and exclusion of unrecited steps or components."[51]   In light of the Board's reasoning and the applicants' comments and amendments, it is clear that the narrowing amendment was intended to and did exclude the presence of the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers (*i.e.*, the claims do not cover formulations containing the unclaimed stereoisomers, especially the RSSR and SRSS stereoisomers).

134.    The Examiner then allowed the "consisting of" Claims 27 and 28, which ultimately issued as Claims 2 and 3 of the '040 Patent in 2003.  Subsequently, the '040 Patent was subjected to reexamination proceedings and a reexamination certificate issued in 2009.

## C.    The Generic Competitors File ANDAs for Generic Versions of Bystolic.

135.    Alkem, Amerigen, Glenmark Indchemie, Hetero, Torrent and Watson were the first generic manufacturers to file ANDAs with the FDA containing Paragraph IV certifications regarding Bystolic patents.  In letters granting final approval to their ANDAs, the FDA noted that each was "one of the first ANDA applicants to submit a substantially complete ANDA with a paragraph IV certification for Nebivolol Tablets."[52]

136.    Because the Generic Competitors were the first companies to file substantially complete ANDAs with Paragraph IV certifications, they each stood to receive 180 days of marketing exclusivity during which the FDA would not give final approval to any later ANDA filer's generic equivalent of Bystolic.

---

[51] Manual of Patent Examining Procedures § 2111.03; *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004).

[52] *See, e.g.*, November 27, 2015 Letter from FDA to Watson, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203683Orig1s000ltr.pdf; May 27, 2017 Letter from FDA to Glenmark, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/ 203821Orig1s000ltr.pdf; June 24, 2015 Letter from FDA to Alkem, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203741Orig1s000ltr.pdf.

137.    Forest received the Generic Competitors' Paragraph IV notice letters on the following dates:

| Manufacturer | Paragraph IV Notice Date |
|---|---|
| Torrent | February 2, 2012[53] |
| Indchemie | February 3, 2012[54] |
| Alkem | February 3, 2012[55] |
| Watson | February 13, 2012[56] |
| Amerigen | February 16, 2012[57] |
| Hetero | February 17, 2012[58] |
| Glenmark | February 20, 2012[59] |

138.    Because they contained Paragraph IV certifications, these notice letters were required to include a detailed statement of the factual and legal bases as to why the '040 Patent was invalid, unenforceable, and/or not infringed by their ANDA products.  The Paragraph IV notice letters were required to include an offer of confidential access to each Generic Competitor's ANDA under the Hatch-Waxman Act.  The notice letters gave rise to a potential cause of action for patent infringement, thereby allowing Forest to file suit against the Generic Competitors under the Hatch- Waxman Act (if Forest otherwise had a basis to sue under Rule 11).

**D.    The Bystolic Patent Litigation.**

139.    On March 13, 2012, in response to their Paragraph IV certification letters, Forest filed a patent infringement lawsuit in the United States District Court for the District of Delaware against Torrent, Watson, Amerigen, Glenmark, and Hetero.[60]

---

[53] *Forest Lab., et al. v. Torrent Pharm. Ltd. et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 93).

[54] *Forest Lab., et al. v. Indchemie Health Specialties PVT et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1 ¶ 22).

[55] *Id*. ¶ 38.

[56] *Forest Lab., et al. v. Torrent Pharm. Ltd. et al*., 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 108).

[57] *Id*. ¶ 123.

[58] *Id*. ¶ 153.

[59] *Id*. ¶ 138.

[60] *Forest Lab., et al. v. Torrent Pharm. Ltd. et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1).

140.    On March 14, 2012, in response to their Paragraph IV certification letters, Forest filed a patent infringement lawsuit in the United States District Court for the Northern District of Illinois against Indchemie and Alkem.[61]

141.    By order of the Judicial Panel for Multidistrict Litigation, these cases were consolidated into *In re Nebivolol Patent (`040) Litigation*, 12-cv-5026 (N.D. Ill. June 12, 2012) (ECF No. 1) (hereafter referred to as the "Nebivolol Patent Litigation").

142.    Forest could not prevail in the Nebivolol Patent Litigation.  The sole independent claim asserted by Forest in the Bystolic Patent Litigation was claim 2, as shown below:

2.    A pharmaceutical composition consisting of a

pharmaceutically acceptable carrier and, as active ingredients:

(a)    the blood pressure reducing compound [2S,αR, 2′R,α′R]-α,α′- [iminobismethylene]bis[6-fluoro-3,4-dihydro-2H-1-benzopyran-2-methanol] having the formula:



or a pharmaceutically acceptable acid addition salt thereof; and

(b)    the compound [2R,αS,2′S,α′S]-α,α′-[iminobismethylene]bis[6-fluoro-3,4-dihydro-2H-1-benzopyran-2-methanol] having the formula:



---

[61] *Forest Lab., et al. v. Indchemie Health Specialties PVT et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1)

or a pharmaceutically acceptable acid addition salt thereof.

'040 Patent at 11:33-12:22.  Thus, claim 2 is limited to a pharmaceutical composition consisting of a pharmaceutically acceptable carrier and, as active ingredients, SRRR-nebivolol and RSSS-nebivolol (or pharmaceutically acceptable acid addition salts).

143.   The Generic Competitors were well aware of the prosecution history of the '040 Patent and the narrowing amendments the applicants had made.  During claim construction proceedings in the Nebivolol Patent Litigation, they correctly argued that the term "consisting of" in claim 2 of the '040 Patent "excludes any unrecited stereoisomers of nebivolol."  The Generic Competitors' products did not infringe because they included at least small amounts of the unrecited stereoisomers of nebivolol, including the RSSR and SRSS stereoisomers.

144.   Early on in the Bystolic Patent Litigation, the Generic Competitors pressed the argument that the "consisting of" transition precluded the use of a plurality of inactive ingredients.  Their position was premised on the argument that (1) a "pharmaceutically acceptable carrier" referred to an individual inactive ingredient in a pharmaceutical formulation; (2) the "consisting of" transition "closed" the claim to unrecited inactive ingredients; and (3) therefore, the claims did not cover formulations having two or more inactive ingredients.  At least one other court has construed "pharmaceutically acceptable carrier" to mean "a conventional pharmaceutically acceptable excipient or additive."[62]  To the extent this interpretation applied in the Nebivolol Patent Litigation, the Generics' products did not infringe for this additional reason.

---

[62] *Schering Corp. v. Mylan Pharm., Inc.*, 2011 U.S. Dist. LEXIS 63825, at *36 (D.N.J. June 15, 2011).

145.     As a result of the foregoing, Forest could not prevail in proving literal infringement of the asserted claims of the '040 Patent.  And, in light of the prosecution history of the '040 Patent, Forest could not prevail based on the doctrine of equivalents.  In addition, Forest's invalidity defenses concerning the asserted claims of the '040 Patent were weak and it could not have prevailed against the Generics' invalidity arguments.  As the Board explained during the prosecution of the '040 Patent:

> [The '362 Patent's] disclosure of compound 84, together with its designation "AB," appears to describe the individual RSSS, SRRR, RSRR and SRSS stereoisomers "just as surely as if they were identified in the reference by name."

The '362 Patent was prior art to the '040 Patent.  In light of the '362 Patent's essentially explicit teaching of a mixture of "the individual RSSS, SRRR, RSRR and SRSS stereoisomers" of nebivolol, the asserted compositions in the '040 Patent were anticipated by, or obvious in view of, the prior art, including other pertinent prior art such as Van de Water *et al.*, Pharmacological and Hemodynamic Profile of Nebivolol, a Chemically Novel, Potent, and Selective B1-Adrenergic Antagonist, Journal of Cardiovascular Pharmacology, 11, No. 5, 552-563 (1988). Any purported evidence of secondary indicia of nonobviousness was insufficient to overcome the clear prima facie obviousness of the claims.

### E.     Forest Enters into Unlawful Reverse-Payment Agreements with the Generic Competitors.

146.     Starting on October 24, 2012, Forest began entering into settlements with Generic Competitors to resolve the Nebivolol Patent Litigation.

147.     Forest's internal and external counsel have conceded that each of these settlements also included "side-deals."  Indeed, in a March 4, 2014, email between Forest's outside lawyers to Forest in-house counsel Eric Agovino, Agovino informed external counsel: "All [Generic

Competitor settlements] had side-deals (one was struck with Alkem, which is a related company with Indchemie)."[63]

148.    The FTC also raised concerns.  Around the time of the merger, in May 2014, Forest received a Civil Investigatory Demand from the FTC seeking information about Defendants' Bystolic settlements with the Generic Competitors.  Allergen's 10-K for the fiscal year ending December 31, 2018, stated:[64]

> Company challenging the lawfulness of patent litigation settlements related to Asacol® and Namenda®.  We have also received requests for information and Statements of Objection in connection with investigations into settlements and other arrangements between competing pharmaceutical companies by the Federal Trade Commission and the European Competition Commission.  For example, in May 2014, Forest received a Civil Investigatory Demand from the FTC requesting information about Forest's agreements with ANDA filers for Bystolic®.  Any adverse outcome of these actions or investigations, or actions or investigations related to other settlements we have entered into, could have a material adverse effect on our business, results of operations, financial condition and cash flows.  Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements."

149.    These side deals were also listed in Forest's Merger Agreement with Actavis as payments to resolve the material contracts" that on information and belief "involve payments . . . of consideration in excess of $15,000,000."[65]  In addition, Forest has also admitted that it reimbursed "certain of the Settling Defendants' legal costs in connection with the patent litigation."[66]  Accordingly, on information and belief, Forest paid each Generic Competitor at least $15,000,000 but likely more, in reverse-payments to resolve the Nebivolol Patent Litigation and induce the Generic Competitors to quit the patent fight.

150.    *Hetero*:  The Hetero reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and

---

[63] *Id*. (emphasis added).

[64] https://www.sec.gov/Archives/edgar/data/1578845/000156459019003111/agn-10k_20181231.htm.

[65] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-RWL (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 69).

[66] https://www.sec.gov/Archives/edgar/containers/fix010/38074/000003807413000024/R17.htm.

Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012," plus payment for Hetero's expended litigation costs, and a "FINAL TERM SHEET between Hetero Drugs Ltd. and Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."[67]

151.    On information and belief, in addition to the monies Forest paid Hetero for Hetero's expended litigation costs, pursuant to the "FINAL TERM SHEET," Forest paid Hetero more than $15,000,000.

152.    *Torrent*:    The    Torrent    reverse-payment    included    the    "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd, and Torrent Pharma Inc. dated November 21, 2012," plus payment for Torrent's expended litigation costs, and a "PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[68]

153.    On information and belief, in addition to the monies Forest paid Torrent for Torrent's expended litigation costs, pursuant to the "PATENT ASSIGNMENT AGREEMENT," Forest paid Torrent more than $15,000,000.

154.    *Alkem*: The Alkem reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012," plus payment for Alkem's expended litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of

---

[67] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-RWL (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 179).

[68] *Id*.

BYSTOLIC patent dispute." Alkem and Forest also entered into an "AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT . . . on January 9, 2013."[69]

155.    On information and belief, in addition to the monies Forest paid Alkem for Alkem's expended litigation costs, pursuant to the Alkem "TERM SHEET," Forest paid Alkem more than $15,000,000.

156.    *Indchemie*: The Indchemie reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Indchemie Health Specialties Private Ltd. dated November 27, 2012," plus payment for Indchemie's expended litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute."[70]

157.    On information and belief, in addition to the monies Forest paid Indchemie for Indchemie's expended litigation costs, pursuant to the Indchemie "TERM SHEET," Forest paid Indchemie more than $15,000,000.

158.    *Glenmark*: The Glenmark reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012," plus payment for Glenmark's expended litigation costs, and a "COLLABORATION AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[71]

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

159.    On information and belief, in addition to the monies Forest paid Glenmark for Glenmark's expended litigation costs, pursuant to the "COLLABORATION AND OPTION AGREEMENT," Forest paid Glenmark more than $15,000,000.

160.    *Amerigen*: The Amerigen reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013," plus payment for Amerigen's expended litigation costs, and a "BINDING TERM SHEET COLLABORATION AGREEMENT" between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."[72]

161.    On information and belief, in addition to the monies Forest paid Amerigen for Amerigen's expended litigation costs, pursuant to the "BINDING TERM SHEET COLLABORATION AGREEMENT," Forest paid Amerigen more than $15,000,000.

162.    *Watson*: The Watson reverse-payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013," plus payment for Watson expended litigation costs, and "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."[73]

---

[72] *Id*. at 180.

[73] *Id*.

163.    On information and belief, in addition to the monies Forest paid Watson for Watson's expended litigation costs, pursuant to the "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc.," Forest paid Watson more than $15,000,000.

164.    On information and belief, the value of each reverse-payment exceeded Forest's avoided litigation costs.

165.    In exchange for these reverse-payments, each Generic Competitor agreed not to compete with Forest in the market for nebivolol HCl, in which Forest had a monopoly, for so long as all others did so also, until September 17, 2021 (a mere three months prior to expiry of the '040 Patent).[74]

166.    The purpose and effect of the reverse-payment agreements were to delay Forest from having to face lower-priced generic competition for years.

167.    But for the reverse-payment agreements, the Generic Competitors would have been ready, able, and willing to launch their generic versions of Bystolic much earlier.

168.    Specifically, the Generic Competitors would have launched by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic (the '580 Patent), or (b) the date their ANDAs were finally approved.

169.    By operation of the CLPs, if *just one* Generic Competitor launched a generic version of Bystolic prior to September 17, 2021 pursuant to any of the three above scenarios, *all* of the other Generic Competitors would have entered the market.

---

[74] https://www.sec.gov/Archives/edgar/containers/fix010/38074/000003807413000024/R17.html.

170.    By about October 2012, when Forest and the Generic Competitors began entering into the reverse-payment agreements, Bystolic was generating hundreds of millions of dollars per year in revenues for Forest.  Losing a substantial portion of that revenue stream in the event any of the Generic Competitors were to prevail on non-infringement or other defenses – or in the event that Forest had not induced the Generic Competitors with reverse-payments to agree to delay launching generic Bystolic – would have drastically reduced Forest's profits.  Thus, Forest had enormous incentives to avoid competition from the Generic Competitors by entering into reverse-payment agreements.

171.    Forest's willingness to provide large payments to each Generic Competitor in exchange for a multi-year delay in competition amounted to an agreement to share with the Generic Competitors the monopoly profits from sales of branded Bystolic at supracompetitive levels.

## VIII.   MARKET POWER AND DEFINITION

172.    As stated above, the pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Bystolic, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect.  The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

173.    Brand manufacturers, including Defendants, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products.  These sales representatives do not advise doctors of the cost of the branded products.  Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive

to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

174.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand – the extent to which unit sales go down when price goes up. This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Bystolic.

175.    Defendants had and continue to have monopoly power in the market for Bystolic because they have the power to exclude competition and/or raise or maintain the price of nebivolol at supra-competitive levels without losing enough sales to make supra-competitive prices unprofitable.

176.    "[T]he size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power-namely, the power to charge prices higher than the competitive level."[75] And a firm that lacks monopoly power is not "likely to pay 'large sums' to induce 'others to stay out of the market'"[76]

177.    A small but significant, non-transitory increase to the price of brand Bystolic would not have caused a significant loss of sales to non-nebivolol HCl products sufficient to make the price increase unprofitable.

---

[75] *Actavis*, 133 S. Ct. at 2236 (citations omitted).

[76] *Id.*

178. Brand Bystolic does not exhibit significant, positive cross-elasticity of demand with respect to price with any other nebivolol HCI product for the treatment of high blood pressure or hypertension or other illnesses treated by Bystolic other than AB-rated generic versions of Bystolic.

179. Brand Bystolic is differentiated from all other nebivolol HCI products, and all other high blood pressure or hypertension products other than the AB-rated generic versions of brand Bystolic.

180. Defendants needed to control only brand Bystolic and its AB-rated generic equivalents, and no other products, in order to maintain the price of nebivolol HCI profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Bystolic without losing substantial sales.

181. Defendants sold brand Bystolic at prices well in excess of marginal costs and in excess of the competitive price, and, therefore, Defendants enjoyed high profit margins.

182. Defendants had, and exercised, the power to exclude generic competition to brand Bystolic.

183. At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Bystolic from the forces of price competition.

184. There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Bystolic, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, *inter alia*, the following facts: (a) generic Bystolic would have entered the market at a much earlier date, at a substantial discount to brand Bystolic, but for Defendants' anticompetitive

conduct; (b) Defendants' gross margin on Bystolic (including the costs of ongoing research/development and marketing) at all relevant times was very high; and (c) Defendants never lowered the price of Bystolic to the competitive level in response to the pricing of other brand or generic drugs.

185.     To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Bystolic and its AB-rated generic equivalents.

186.     Defendants' anticompetitive reverse payments to the Generic Competitors demonstrate that Defendants enjoyed market and/or monopoly power with respect to nebivolol HCI.

187.     The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

188.     Defendants' market share in the relevant market is 100% implying substantial monopoly power.

## IX.     MARKET EFFECTS

189.     Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition.   Defendants designed a scheme to delay competition, to further Defendants' anticompetitive purpose of forestalling generic competition against Bystolic, in which the Generic Competitors cooperated in order to increase their own profits.   Defendants carried out the scheme with the anticompetitive intent and effect of maintaining supra-competitive prices for nebivolol HCI tablets.

190.     Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Bystolic.   These actions allowed

Defendants to maintain a monopoly and exclude competition in the market for Bystolic and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the proposed End-Payor Class.

191.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Defendants to sell Bystolic without further generic competition.  Were it not for Defendants' illegal conduct, one or more additional generic versions of Bystolic would have entered the market sooner.

192.    Defendants' illegal acts and conspiracy to delay generic competition for Bystolic caused Plaintiff and all Class members to pay more than they would have paid for nebivolol HCI absent this illegal conduct.

193.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, End-Payor purchasers, such as Plaintiff and Class members, would have paid less for nebivolol HCI by (a) paying lower prices on their remaining brand purchases of Bystolic, (b) substituting purchases of less-expensive generic Bystolic for their purchases of more-expensive brand Bystolic, and/or (c) purchasing generic Bystolic at lower prices sooner.

194.    Thus, Defendants' unlawful conduct deprived Plaintiff and members of the Class of the benefits from the competition that the antitrust laws are designed to ensure.

## X.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

195.    During the relevant time period, Defendants manufactured, promoted, sold, distributed and shipped Bystolic across state and national lines throughout the United States in a continuous and uninterrupted flow of interstate commerce.

196.    During the relevant time period, Plaintiff and members of the proposed Class

purchased substantial amounts of nebivolol HCl indirectly from Defendants. As a result of Defendants' illegal conduct, Plaintiff and the members of the Class were compelled to pay, and did pay, artificially inflated prices for nebivolol HCl. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of branded Bystolic was artificially inflated by Defendants' illegal conduct, (2) Class members were deprived of the opportunity to purchase lower-priced generic versions of Bystolic sooner, and/or (3) the price of AB-rated Bystolic was artificially inflated by Defendants' illegal conduct. The supracompetitive prices were paid at the point of sale, which is where Plaintiff and the proposed End-Payor Class suffered antitrust impact.

197.    As a consequence, Plaintiff and the proposed members of the Class have sustained substantial damages to their business and property in the form of overcharges. The full amount and forms of components of such damages will be calculated after discovery and upon proof at trial. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charges to end payors such as Plaintiff and the proposed members of the Class.

198.    General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. According to Professor Hovenkamp, "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." Professor Hovenkamp also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[77]

---

[77] *See* Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624.

199.     Further, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end payors.   Wholesalers and retailers passed on the inflated prices of Bystolic to Plaintiff and the Class of end-payors defined herein.   Defendants' anticompetitive actions enabled them to indirectly charge End-Payors prices in excess of what they otherwise would have been able to charge absent their unlawful actions with the Generic Competitors.

200.     The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct individually and with the Generic Competitors.

201.     The inflated prices the proposed End-Payor Class paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

202.     During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce.   All Defendants engaged in illegal activities, as charged in herein, within the flow of, and substantially affecting, interstate commerce.

203.     Defendants' conduct was within the flow of, and was intended to have and did have a substantial effect on, interstate commerce of the United States, including in this District.

204.     During the Class Period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme.   The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## XI.     EFFECT ON INTRASTATE COMMERCE

205.     During the relevant time period, branded Bystolic, manufactured and sold by Defendants, was shipped into each state and was sold to or paid for by End-Payors.

206.    During the relevant time period, in connection with the purchase and sale of branded Bystolic, monies exchanged hands and business communications and transactions occurred in each state.

207.    Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering cheaper Bystolic and generic nebivolol HCl to members of the proposed End-Payor Class purchasing inside each respective state, and Defendants entered into an unlawful anticompetitive agreement that affected commerce in each state.

## XII.    CLASS ACTION ALLEGATIONS

208.    Plaintiff brings this action on its own behalf and on behalf of all others similarly situated as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3), seeking damages pursuant to the common law of unjust enrichment and the antitrust, unfair competition, unjust enrichment and consumer protection laws of the states listed below , and as representative of an End-Payor Class defined as follows:

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of brand or generic Bystolic from June 2, 2015 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

Excluded from the Class are:

a.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

b.    all federal governmental entities;

c.    all persons or entities who purchased Bystolic for purposes of resale;

d.    fully insured health plans (*i.e.*, health plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

    e.    any "flat co-pay" consumers whose purchases of Bystolic were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

    f.    pharmacy benefit managers; and

    g.    all judges assigned to this case and any members of their immediate families.

209.    Members of the Class are so numerous and widely geographically dispersed throughout the United States and its territories that joinder is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class, in an amount to be determined in discovery and at trial. Further, the identities of Class members will be readily ascertainable through business records kept in regular order.

210.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, and all paid artificially inflated prices for Bystolic and were deprived of the benefits of competition from less expensive generic versions as a result of Defendants' conduct.

211.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, the Class.

212.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving the pharmaceutical industry.

213.    Questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

214.    Questions of law and fact common to the Class include:

a.    whether the conduct alleged herein constitutes a violation of the antitrust laws;

b.    whether Defendants conspired with each of their Generic Competitors to suppress generic competition to Bystolic;

c.    whether Defendants' anticompetitive scheme suppressed generic competition to Bystolic;

d.    whether Defendants' challenged conduct fixed, raised, maintained or stabilized the price of nebivolol HCl;

e.    as to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the markets in which Bystolic is sold;

f.    whether a relevant antitrust market needs to be defined in this case in light of the existence of direct proof of Defendants' power to exclude generic competition and charge supracompetitive prices for Bystolic;

g.    to the extent a relevant antitrust market or markets needs to be defined, what the definition of the relevant antitrust market for analyzing Defendants' monopoly power is, and whether Defendants had monopoly power in the relevant antitrust market;

h.    whether Defendants illegally obtained or maintained monopoly power in the relevant market;

i.      whether Defendants' actions were, on balance, unreasonable restraints of trade;

j.      determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic, unfair, and unjust conduct caused;

k.      whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

l.      whether Defendants' scheme, in whole or in part, has substantially affected intrastate commerce;

m.      whether Defendants' compensation to the Generic Competitors was large and unexplained;

n.      whether the reverse payment agreement created a bottleneck to further delay generic competition;

o.      whether the reverse payment harmed competition;

p.      whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Bystolic;

q.      whether Defendants' scheme, in whole or in part, and to what extent, caused antitrust injury to the business or property of Plaintiff and members of the Class in the nature of overcharges; and

r.      the quantum of overcharges paid by the Class in the aggregate.

215.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

216.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### XIII.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS

217.    In accordance with the requirements of Arizona Revised Statute § 44-1415; Hawaii Revised Statute § 480-13.3(a); 815 Illinois Compiled Statutes § 505/10a(d); Nevada Revised Statute § 598A.210(3); New York General Business Law § 340(5); Rhode Island General Laws § 6-36-21; and Utah Code § 76-10-3109, on or about August  7, 2020, counsel sent letters to:

      a.      Mark Brnovich, Attorney General of Arizona;

      b.      Clare E. Connors, Attorney General of Hawaii;

      c.      Kwame Raoul, Attorney General of Illinois;

      d.      Aaron Ford, Attorney General of Nevada;

      e.      Letitia James, Attorney General of New York;

      f.      Peter F. Neronha, Attorney General of Rhode Island; and

      g.      Sean Reyes, Attorney General of Utah,

informing them of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of this Class Action Complaint.

218.    On or about August 7, 2020, class counsel sent demand letters to Defendants AbbVie, Allergan and Forest.   These demand letters satisfy the requirements of West Virginia

Code § 46A-6-106(c). The demand letters identified the claimants as Plaintiff and all end payor purchasers of Bystolic in individual and representative capacities; described the unfair or deceptive acts or practices committed by Defendants' and the Generic Competitors' entry into unlawful and anticompetitive settlements between Defendants and the Generic Competitors; described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (treble damages, attorneys' fees, litigation costs, and other available sanctions); and requested an offer to cure within the statutorily prescribed time.

219.   On or about August 7, 2020, class counsel also sent demand letters to Defendants AbbVie, Allergan and Forest.  These demand letters satisfy the requirements of 10 Me. Rev. Stat. tit. 5 § 213-1-A.  The demand letters identified the claimants as Plaintiff and all end payor purchasers of Bystolic in individual and representative capacities; described the unfair or deceptive acts or practices committed by Defendants' and the Generic Competitors' entry into an unlawful and anticompetitive settlement between Defendants and the Generic Competitors; described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (actual damages, attorneys' fees, litigation costs, and other available sanctions); and requested an offer to cure.

220.   The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply to Defendants because Defendants have not identified a place of business or assets within Massachusetts.  In an abundance of caution, however, Plaintiff, on behalf of itself and all others similarly situated, served each Defendant (as identified above) with a written demand for relief, on or about August 7, 2020.  The demand letters identified the claimants as Plaintiff and all end payor purchasers of Bystolic, in  individual and representative capacities; described the unfair or deceptive acts or practices committed by the   Defendants

63

(including the entry into an unlawful and anticompetitive settlement between Defendants and the Generic Competitors); described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (treble damages, attorneys' fees, litigation costs, and other available sanctions); and requested an offer to cure within the statutorily prescribed time.

221.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply to claims brought by Plaintiff Local 1150 because Local 1150 is "engage[d] in the conduct of any trade or commerce" and therefore can bring its claims under Massachusetts General Laws Annotated 93A § 11.  Local 1150 is engaged in trade or commerce because it purchased, paid, and/or provided reimbursement for some or all of the purchase price for Bystolic in Massachusetts.  Section 11 does not require notice.  *See Nader v. Citron*, 372 Mass. 96, 101 (1977).  In an abundance of caution, however, Plaintiff, on behalf of itself and all others similarly situated, served each Defendant (as identified above) with a written demand for relief as described in the prior paragraph.

## XIV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELEIF
### For Monopolization and Monopolistic Scheme Under State Law
### (Asserted Against All Defendants)

222.    Plaintiff incorporates by reference all the allegations above as though fully set forth herein.

223.    As described above, Defendants have possessed and continue to possess monopoly power nationwide and in each of the United States and its territories in the market for nebivolol HCI.  No other manufacturer will sell a competing version of Bystolic before September 17, 2021.

224.    At all relevant times, Defendants have possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Defendants have possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

225.    Through their overarching anticompetitive scheme, as alleged above, Defendants have willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiff and the Class.  Defendants' anticompetitive conduct was done with the specific intent to maintain their monopoly in the market for Bystolic in the United States.

226.    Defendants knowingly and intentionally engaged in this anticompetitive scheme to monopolize the nebivolol HCI market as described above.  Defendants accomplished this scheme by, *inter alia*, (1) allocating to themselves 100% of the market for nebivolol HCI in all strengths in the United States until September 17, 2021; (2) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; and (3) fixing, raising and maintaining the prices so that Plaintiff and proposed Class members would pay for Bystolic at supracompetitive prices.

227.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCI products in the United States at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the price of nebivolol HCI products from declining dramatically.

228.    The goal, purpose and effect of Defendants' scheme was also to maintain and extend its monopoly power with respect to nebivolol HCI products.  Defendants' illegal scheme

allowed them to continue charging supracompetitive prices for nebivolol HCl products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

229.    Plaintiff and members of the proposed Class purchased substantial amounts of Bystolic indirectly from Defendants.

230.    As a result of Defendants' illegal conduct, Plaintiff and members of the proposed Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCl requirements absent Defendants' illegal conduct.  But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCl products would have been lower, sooner.

231.    Had the Generic Competitors entered the market and lawfully competed with Defendants, Plaintiff and other members of the proposed Class would have substituted lower-priced generic nebivolol HCl products for the higher-priced brand-name Bystolic for some or all of their nebivolol HCl products requirements, and/or would have paid lower net prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

232.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

> a.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of Bystolic in Arizona by members of the Class.
>
> b.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases of Bystolic in California by members of the Class.

c.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by members of the Class.

d.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Bystolic in Florida by members of the Class.

e.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Hawaii Rev. Stat. 480-1, *et seq.* with respect to purchases of Bystolic in Hawaii by members of the Class.

f.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*), with respect to purchases of Bystolic in Illinois by members of the Class.

g.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Iowa Code §§ 553.5 *et seq.*, with respect to purchases of Bystolic in Iowa by members of the Class.

h.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kansas Stat. Ann. § 50-161 (b) *et seq.*, with respect to purchases of Bystolic Kansas by members of the Class.

i.      Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of Bystolic in Maine by members of the Class.

j.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Md. Com'l Law Code Ann. § 11-201, *et seq.*, with respect to purchases of Bystolic in Maryland by members of the Class.

k.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Bystolic in Massachusetts by members of the Class.

l.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of Bystolic in Michigan by members of the Class.

m.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Bystolic in Minnesota by members of the Class.

n.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic in Mississippi by members of the Class.

o.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mont. Code § 30-14-103, *et seq.*, with respect to purchases of Bystolic in Montana by members of the Class.

p.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Bystolic in Nebraska by members of the Class.

q.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic in Nevada by members of the Class.

r.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Bystolic in New Hampshire by members of the Class.

s.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic in New Mexico by members of the Class.

t.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.Y. Gen. Bus. Law § 340, *et seq.*, with respect to purchases of Bystolic in New York by members of the Class.

u.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic in North Carolina by members of the Class.

v.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of Bystolic in North Dakota by members of the Class.

w.   Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. § 646.730, *et seq.*, with respect to purchases of Bystolic in Oregon by members of the Class.

x.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases of Bystolic in Rhode Island by members of the Class.

y.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Bystolic in South Dakota by members of the Class.

z.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by members of the Class.

aa.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Bystolic in Utah by members of the Class.

bb.    Defendants intentionally and wrongfully maintained monopoly power in the relevant markets in violation of W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Bystolic in West Virginia by members of the Class.

cc.    Defendants intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in Wisconsin by members of the Class.

233.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim.  Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic nebivolol HCl, sooner, and (2) paying higher prices for nebivolol HCl products than they would have paid in the absence of

Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

234.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

**SECOND CLAIM FOR RELIEF**
**For Conspiracy to Monopolize Under State Law**
**(Asserted Against All Defendants and Unnamed (as defendants) Generic**
**Competitors/Co-Conspirators)**

235.    Plaintiff incorporates by reference all the allegations above as though fully set forth herein.

236.    This claim is pled against all Defendants as well as each of the unnamed (as defendants) Generic Competitors/Co-Conspirators.

237.    Defendants and each of the Generic Competitors committed at least one overt act in furtherance of the conspiracy.

238.    As described above, Defendants have possessed monopoly power nationwide and in each of the United States in the market for nebivolol HCI. No other manufacturer has sold a competing generic version of Bystolic.

239.    Defendants willfully and unlawfully engaged in a continuing illegal conspiracy to monopolize the nebivolol HCI by engaging in an anticompetitive scheme to keep generic equivalents from the market—not as a result of providing a superior product, business acumen, or historical accident.

240.    Defendants knowingly and intentionally conspired to monopolize the nebivolol HCI products (*i.e.*, Bystolic in all forms and dosage strengths) and AB-rated bioequivalent nebivolol HCI products market as described above. Defendants accomplished this scheme by, *inter alia*, (1) entering into illegal agreements with each of the Generic Competitors which delayed

71

the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; (2) fixing, raising and maintaining the prices so that Plaintiff and Class members would pay for Bystolic at supracompetitive prices; (3) unlawfully agreeing to divide a market and delay price reductions and generic competition for Bystolic; (4) allocating to Forest 100% of the U.S. sales of nebivolol HCI until September 17, 2021; and (5) otherwise conspiring to unlawfully monopolize and conspire to monopolize the market for nebivolol HCI.

241.    Each of the reverse-payment agreements between Forest and the Generic Defendants were unlawful and were large and unjustified.  Each agreement between Forest and the Generic Competitors harmed the proposed Class as set forth above.

242.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payment agreements between Forest and each of the Generic Competitors that outweighs their harmful effects.  Even if there were some conceivable justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

243.    The goal, purpose, and direct and foreseeable effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCI products in the United States and its territories at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the average market price of nebivolol HCI products from declining dramatically.

244.    The goal, purpose and direct and foreseeable effect of Defendants' scheme was also to maintain and extend its monopoly power with respect to nebivolol HCI products.  Defendants' illegal scheme allowed Defendants to continue charging supracompetitive prices for nebivolol HCI products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

245.    Plaintiff and members of the Class purchased substantial amounts of Bystolic indirectly from Defendants.

246.    As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCI requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCI products would have been lower, sooner.

247.    Had manufacturers of generic nebivolol HCI entered the market and lawfully competed with Defendants, Plaintiff and other members of the Class would have substituted lower-priced generic nebivolol HCI products for the higher-priced brand-name Bystolic for some or all of their nebivolol HCI products requirements, and/or would have paid lower net prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

248.    But for Defendants' illegal conduct, competitors would have begun marketing generic versions of Bystolic well before September 17, 2021, and they would have been able to market such versions more successfully.

249.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

a.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Bystolic in Arizona by members of the Class.

b.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Cal. Bus. & Prof. Code §§

16700 and 17200, *et seq.*, with respect to purchases of Bystolic in California by members of the Class.

c.  Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by members of the Class.

d.  Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Bystolic in Florida by members of the Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Hawaii Rev. Stat. 480-1, *et seq.*, with respect to purchases of Bystolic in Hawaii by members of the Class.

f.  Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*), with respect to purchases of Bystolic in Illinois by members of the Class.

g.  Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Iowa Code §§ 535.5, *et seq.*, with respect to purchases of Bystolic in Iowa by members of the Class.

h.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Bystolic in Kansas by members of the Class.

i.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of Bystolic in Maine by members of the Class.

j.     Defendants intentionally and wrongfully engaged in conspiracy to monopolize the relevant market in violation of Md. Com'l Law Code Ann. § 11-201, *et seq.*, with respect to purchases of Bystolic in Maryland by members of the Class.

k.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Bystolic in Massachusetts by members of the Class.

l.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Bystolic in Michigan by members of the Class.

m.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Minn. Stat. §§ 325D.49, *et*

*seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Bystolic in Minnesota by members of the Class.

n.    Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic in Mississippi by members of the Class.

o.    Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Mont. Code § 30-14-103, *et seq.*, with respect to purchases of Bystolic in Montana by members of the Class.

p.    Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Bystolic in Nebraska by members of the Class.

q.    Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic in Nevada by members of the Class.

r.    Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Bystolic in New Hampshire by members of the Class.

s.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic in New Mexico by members of the Class.

t.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Bystolic in New York by members of the Class.

u.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic in North Carolina by members of the Class.

v.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Bystolic in North Dakota by members of the Class.

w.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Or. Rev. Stat. § 646.730, *et seq.*, with respect to purchases of Bystolic in Oregon by members of the Class.

x.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of R.I. Gen. Laws §§ 6-36-5 *et*

*seq.*, with respect to purchases of Bystolic in Rhode Island by members of the Class.

y.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to purchases of Bystolic in South Dakota by members of the Class.

z.      Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by members of the Class.

aa.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Bystolic in Utah by members of the Class.

bb.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant markets in violation of W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Bystolic in West Virginia by members of the Class.

cc.     Defendants intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in Wisconsin by members of the Class.

250.   Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this claim. Their injuries consist of: (1)

being denied the opportunity to purchase lower-priced generic nebivolol HCI products, sooner, and (2) paying higher prices for nebivolol HCI products than they would have paid in the absence of Defendants' conduct.  These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

251.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

### THIRD CLAIM FOR RELIEF
**Combination and Conspiracy in Restraint of Trade**
**(Asserted Against All Defendants and Unnamed (as defendants) Generic**
**Competitors/Co-Conspirators)**

252.    Plaintiff incorporates by reference all the allegations above as though fully set forth herein.

253.    This claim is pled against all Defendants as well as each of the unnamed (as defendants) Generic Competitors/Co-Conspirators.

254.    Defendants and each of the Generic Competitors committed at least one overt act in furtherance of the conspiracy.

255.    Defendants willfully and unlawfully engaged in a continuing illegal contract, combination, and conspiracy to restrain trade in the nebivolol HCI market by engaging in an anticompetitive scheme to keep generic equivalents from the market and to allocate the market between horizontal competitors.

256.    Defendants accomplished this scheme by, *inter alia*, (1) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; (2) raising and maintaining the prices so that Plaintiff and Class members would pay for Bystolic at supracompetitive prices; (3) unlawfully agreeing to divide a market and delay price reductions and

generic competition for Bystolic; (4) allocating to Forest 100% of the U.S. sales of nebivolol HCI until September 17, 2021; and (5) entering into illegal settlement agreements to cover the terms of the agreement allocating the market for nebivolol HCI in the United States and its territories.

257.    The agreements between Defendants are horizontal market allocation and price fixing agreements between actual or potential competitors and are illegal *per se* under state antitrust laws.  Alternatively, this Complaint alleges that these agreements are an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis.

258.    Alternatively, Defendants' agreements are presumptively anticompetitive reverse payment settlements, subject to "quick look" rule of reason scrutiny, because Defendants provided substantial consideration in exchange for each generic manufacturer's agreement to delay market entrance.

259.    Through the agreements, Defendants and the Generic Competitors joined in an anticompetitive scheme as co-conspirators.  The reverse-payment agreements are and were a contract, combination and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to: (a) allocate all sales of nebivolol HCI in the United States and its territories to Defendants until September 17, 2021; (b) prevent the sale of any generic version of nebivolol HCI in the United States and its territories until September 17, 2021; and (c) fix, raise and/or maintain the price at which the End-Payor Plaintiffs and all members of the proposed End-Payor Class would pay for nebivolol HCI.

260.    Under Defendants' reverse payment agreement, Defendants paid the Generic Competitors financial inducements through large and unexplained payments that vastly exceed the cost of avoided litigation and are not otherwise explained by the value of any services provided by

the Generic Competitors to Defendants (other than Generic Competitors' agreement to delay launching their generic Bystolic). There are no valid, non-pretextual procompetitive business justifications for the settlement agreements, nor for the payments to the Generic Competitors under the settlement agreements. Even if there were some conceivable justification, the settlement agreements and the payments flowing to the Generic Competitors under the agreements, were not reasonably necessary to achieve settlement.

261.    In exchange for these payments, the Generic Competitors agreed to, and did, delay introduction of their generic Bystolic in the United States.

262.    The anticompetitive consequences of Defendants' reverse payment agreement are sufficiently great and sufficiently unrelated to the settlement of the underlying patent dispute, to amount to an unlawful reverse payment agreement, as evidenced by, *inter alia*, the following:

      a.    Delaying the entry of a generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits;

      b.    The agreements created bottlenecks that prevented and delayed generic entry by other generic manufacturers; and

      c.    There was no countervailing pro-competitive benefits from the agreements.

263.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCl products in the United States and its territories at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the average market price of nebivolol HCl products from declining dramatically.

81

264.    The goal, purpose and effect of Defendants' scheme was also to maintain and extend Defendants' monopoly power with respect to nebivolol HCI products.  The illegal scheme allowed Defendants to continue charging supracompetitive prices for nebivolol HCI products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

265.    Plaintiff and members of the Class purchased substantial amounts of Bystolic indirectly from Defendants and/or other manufacturers.

266.    As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCI requirements absent Defendants' illegal conduct.  But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCI products would have been lower, sooner.

267.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of the following state antitrust laws:

     a.    Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Arizona by members of the Class.

     b.    Cal. Bus. & Prof. Code §§ 16700 and 17200, *et seq.*, with respect to purchases of Bystolic in California by members of the Class.

     c.    D.C. Code §§ 28-4502, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by members of the Class.

     d.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Bystolic in Florida by members of the Class.

e.    Hawaii Revised Statutes annotated § 480-1, *et seq*., with respect to purchases of Bystolic and in Hawaii by members of the Class.

f.    Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.), with respect to purchases of Bystolic in Illinois by members of the Class.

g.    Iowa Code § 553.4, *et seq*., with respect to purchases of Bystolic in Iowa by members of the Class.

h.    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Bystolic in Kansas by members of the Class.

i.    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases of Bystolic in Maine by members of the Class.

j.    Md. Com'l Law Code Ann. § 11-201, *et seq.*, with respect to purchases of Bystolic in Maryland by members of the Class.

k.    Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Massachusetts by members of the Class.

l.    Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Bystolic in Michigan by members of the Class.

m.    Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Bystolic in Minnesota by members of the Class.

n.    Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Mississippi by members of the Class.

o.    Mont. Code § 30-14-201, *et seq.*, with respect to purchases of Bystolic in Montana by members of the Class.

p.      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Bystolic in Nebraska by members of the Class.

q.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic in Nevada by members of the Class.

r.      N.H. Revised Statutes § 356:1, *et seq.*, with respect to purchases of Bystolic in New Hampshire by members of the Class.

s.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New Mexico by members of the Class.

t.      N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Bystolic in New York by members of the Class.

u.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Bystolic in North Carolina by members of the Class.

v.      N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Bystolic in North Dakota by members of the Class.

w.      Or. Rev. Stat. § 646.725, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Oregon by members of the Class.

x.      R.I. Gen. Laws § 6-36-4, et seq., with respect to purchases of Bystolic in Rhode Island by members of the Class.

y.      S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*, with respect to purchases of Bystolic in South Dakota by members of the Class.

z.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by members of the Class.

aa.     Utah Code Annotated § 76-10-3103, *et seq*., with respect to purchases of

Bystolic in Utah by members of the Class.

bb.     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Bystolic and

AB-rated bioequivalents in West Virginia by members of the Class.

cc.     Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in

Wisconsin by members of the Class.

268.    Plaintiff and members of the Class have been injured in their business or property

by reason of Defendants' antitrust violations alleged in this Claim.  Their injuries consist of: (1)

being denied the opportunity to purchase lower-priced nebivolol HCl generic products sooner, and

(2) paying higher prices for nebivolol HCl products than they would have paid in the absence of

Defendants' conduct.  These injuries are of the type the antitrust laws were designed to prevent,

and flow from that which makes Defendants' conduct unlawful.

269.    Plaintiff and the Class seek damages and multiple damages as permitted by law for

their injuries by Defendants' violation of the aforementioned statutes.

### FOURTH CLAIM FOR RELIEF
**Unfair or Deceptive Trade Practices**
**(Asserted Against All Defendants and Unnamed (as defendants) Generic**
**Competitors/Co-Conspirators)**

270.    Plaintiff incorporates by reference all the allegations above as though fully set forth

herein.

271.    Defendants engaged in unfair competition, and/or unfair/unconscionable, and/or

deceptive acts or practices in violation of the state consumer protection statutes listed below.  As

a  direct  and  proximate  result  of  Defendants'  anticompetitive,  deceptive,  unfair  and/or

unconscionable acts or practices, Plaintiff and Class members were deprived of the opportunity to

purchase a less expensive AB-rated bioequivalents and forced to pay higher prices.

85

a.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

b.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*

c.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*

d.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann.§§ 505.1, *et seq.*

e.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*

f.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*, in that the actions and transactions alleged herein occurred primarily and substantially within Massachusetts, with thousands of end-payors paying substantially higher prices for Bystolic.

g.    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*

86

h.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*

i.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*

j.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*

k.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*

l.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*  To the extent New York law so requires, Plaintiffs hereby forgo any minimum or punitive damages in order to preserve the right of New York Class members to recover actual damages by way of a class action.

m.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1, *et seq.*

n.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of R.I. Gen. Law § 6-13.1-1, *et seq.*

o.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Tenn. Code Ann. 47-18-101, *et seq.*

p.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

q.   Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*

272.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair/unconscionable and/or deceptive acts or practices alleged in this Count.  Their injury consists of paying higher prices for Bystolic than they would have paid in the absence of these violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment Under State Law**
**(Fifty States & District of Columbia, Except Ohio and Louisiana)**
**(Against All Defendant)**

273.   Plaintiff incorporates by reference all the allegations above as though fully set forth herein.

274.   To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

88

275.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Bystolic.

276.    Defendants' financial benefits are traceable to Plaintiff's and Class members' overpayments for Bystolic.

277.    Plaintiff and Class members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Class members.

278.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Class for Bystolic manufactured by Defendants during the Class Period.

279.    It would be futile for Plaintiff and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Bystolic, as those intermediaries are not liable and would not compensate Plaintiff and Class members for Defendants' unlawful conduct.

280.    The economic benefit Defendants derived from overcharging Plaintiff and Class members for Bystolic is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

281.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Class members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

282.    It would be inequitable under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia, except for Indiana and Ohio, for Defendants to retain any of the overcharges Plaintiff and Class members paid for Bystolic and/or its AB-rated generic equivalents that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

283.    Defendants are aware of and appreciate the benefits that Plaintiff and the Class members have bestowed upon them.

284.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Class members, who collectively have no adequate remedy at law.

285.    Plaintiff and Class members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Class members may make claims on a *pro rata* basis.

## SIXTH CLAIM FOR RELIEF
### Injunctive Relief
### (Against All Defendants and Unnamed (as defendants) Generic Competitors/Co-Conspirators)

286.    Plaintiff incorporates by reference all the allegations above as though fully set forth herein.

287.    As set forth in Count 1, 2, 3, 4, 5 and 11, Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

288.    Plaintiff requests that the Court granted injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 as may be necessary and appropriate to restore competition in the market for nebivolol HCI.

90

### XV.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed Class, prays for judgment against all Defendants, jointly and severally, and that this Court:

1. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the proposed Class, and appoint Plaintiff as the named representative of the class;

2. Enter joint and several judgment against each of the Defendants on the all Claims (First through Sixth) above and in favor of Plaintiff and the proposed Class;

3. Grant permanent injunctive relief:

   a. enjoining Defendants from continuing their illegal conduct;

   b. enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of delaying the entry of generic nebivolol HCl or other generic drugs; and

   c. requiring Defendants to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

4. Award Plaintiff and the proposed Class damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest, in accordance with law;

5. Grant Plaintiff and the proposed Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

6. Award Plaintiff and the proposed Class their costs of suit, including reasonable attorneys' fees as provided by law; and

7.     Award such other and further relief as the Court deems just and proper.

## XVI.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on behalf of itself and the proposed Class, demand a trial by jury of all claims and issues so triable.


Dated: August 7, 2020                    */s/ Frank R. Schirripa*
                                         Frank R. Schirripa
                                         David R. Cheverie
                                         Kathryn A. Hettler
                                         **Hach Rose Schirripa & Cheverie LLP**
                                         112 Madison Avenue, 10th Floor
                                         New York, New York 10016
                                         Telephone: (212) 213-8311
                                         Facsimile: (212) 779-0028
                                         fschirripa@hrsclaw.com
                                         DC@hachroselaw.com
                                         kh@hrsclaw.com

                                         Sharon K. Robertson
                                         **Cohen Milstein Sellers & Toll PLLC**
                                         88 Pine Street, 14th Floor
                                         New York, New York 10005
                                         Telephone: (212) 838-7797
                                         Facsimile: (212) 838-7745
                                         srobertson@cohenmilstein.com


                                         *Counsel for Plaintiff Teamsters Local No. 1150 Prescription Drug Benefit Plan*